# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TALKDESK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. N23C-08-005 MAA CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| DM TRANS, LLC d/b/a ARRIVE | ) | |
| LOGISTICS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Submitted: February 9, 2024
Decided: May 31, 2024

*Upon Plaintiff's Motion to Dismiss:*
GRANTED in Part, and DENIED in Part.

## <u>MEMORANDUM OPINION</u>

Peter H. Kyle, Esquire, and Daniel P. Klusman, Esquire, of DLA PIPER LLP, Wilmington, Delaware, and Matthew J. Jacobs, Esquire (Argued), Jessica S. Heim, Esquire, and Emily Margolis, Esquire, of DLA PIPER LLP, San Francisco, California, *Attorneys for Plaintiff/Counterclaim Defendant Talkdesk, Inc.*

Rudolf Koch, Esquire, Elizabeth J. Freud, Esquire, and Nicholas F. Mastria, Esquire, of RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware, and Michael T. Jones, Esquire (Argued), and Ashley V. Hart, Esquire, of HOLLAND & KNIGHT LLP, Boston, Massachusetts, *Attorneys for Defendant/Counterclaim Plaintiff DM Trans, LLC (d/b/a Arrive Logistics).*

**Adams, J.**

# I. INTRODUCTION

Talkdesk, Inc. ("Talkdesk") entered into a contract with DM Trans, LLC d/b/a Arrive Logistics ("Arrive") wherein Talkdesk would provide communication services for Arrive's use in conducting Arrive's business. Arrive alleges that it indicated its needs, prompted primarily by the COVID-19 pandemic, to which Talkdesk repeatedly affirmed that Talkdesk's products could meet those needs. Talkdesk and Arrive subsequently entered into a contract outlining Talkdesk's services. After multiple years of Arrive informing Talkdesk of problems with the products and requesting improvements, Arrive terminated the contract and asserts several claims, via Counterclaims, against Talkdesk. Talkdesk filed a Motion to Dismiss Arrive's Counterclaims. For the reasons that follow, the Motion to Dismiss is GRANTED in Part, and DENIED in Part.

# II. FACTS[1]

## A. THE PARTIES

Plaintiff/Counterclaim Defendant Talkdesk is a Delaware corporation with its headquarters in San Francisco, California.[2] Talkdesk is a cloud-based call-center software provider.[3]

---

[1] The facts are drawn from Defendant's Answer, Affirmative Defenses and Counterclaims to Plaintiff's Complaint. D.I. 4 [hereinafter "Countercl."]. The Court acknowledges that Defendant is also Counterclaim Plaintiff, but for clarity, the Court will continue to refer to Talkdesk as Plaintiff and Arrive as Defendant.

[2] Countercl. ¶ 1.

[3] *Id.* ¶ 6.

Defendant/Counterclaim Plaintiff, Arrive, has its principal place of business in Austin, Texas.[4] Arrive is "a leading North American freight broker that provides transportation logistics services to parties seeking to ship goods by utilizing Arrive's network of third-party carriers."[5] Arrive has received several awards and high recognition from its customers for excellent customer service.[6]

## B. ARRIVE'S BUSINESS OPERATIONS

Arrive has over 2,000 employees, 6,000 customers, 38,000 active motor carriers, and about 70,000 motor carriers under contract, making it one of the largest freight brokerage firms in the industry.[7] The Business Development and Carrier Sales teams work in a shared space—a total of approximately 1500 employees.[8] The employees make and receive a high number of phone calls with customers, shippers, and motor carriers.[9] The effectiveness of Arrive's entire business relies on efficient and reliable communication methods so as to avoid the possibility of a competitor taking the opportunity from Arrive.[10] "Telephone usage, along with Arrive's industry leading proprietary transportation management system software and related applications, is the heartbeat of Arrive's core operations."[11]

---

[4] *Id.* ¶ 2.
[5] *Id.* ¶ 5.
[6] *Id.*
[7] *Id.* ¶ 7.
[8] *Id.* ¶¶ 8–9.
[9] *Id.* ¶¶ 9–15.
[10] *Id.* ¶¶ 10–12.
[11] *Id.* ¶ 16.

## C. THE IMPACT OF COVID ON ARRIVE

When the COVID-19 pandemic forced businesses to transition to remote work, Arrive struggled because of its heavy reliance on its "telephony systems to carry out their necessary work."[12] The company's first solution, use of personal phones, was insufficient because of security concerns, confidentiality concerns, less reliable and clear service, and an inability to track key performance metrics.[13] Arrive determined it would instead need to find a vendor that could handle a high volume of inbound and outbound calls.[14] Arrive created a 150-question Request for Information ("RFI") for potential vendors to indicate their capacity.[15]

In late-April 2020, Talkdesk responded affirmatively to every question on the RFI and the two companies began to discuss solutions and pricing.[16] Over the next few months, on at least ten occasions, members of both companies engaged in email and virtual meetings to explore Talkdesk's products and how those products could suit Arrive's needs.[17] Arrive clearly described the capabilities it would need for its business, all of which Talkdesk's representatives assured Arrive it could provide.[18] Arrive received other vendor proposals, but based on Talkdesk's assurances of its

---

[12] *Id.* ¶ 17.
[13] *Id.* ¶ 18.
[14] *Id.* ¶ 19.
[15] *Id.* ¶ 20.
[16] *Id.* ¶¶ 21–22.
[17] *Id.* ¶¶ 23–28, 83.
[18] *Id.* ¶¶ 28–31, 84–85.

ability to meet Arrive's needs, Arrive chose Talkdesk as Arrive's cloud-based telephony provider.[19]

## D. THE MASTER SUBSCRIPTION AGREEMENT

On approximately June 30, 2020, Arrive and Talkdesk entered into the Master Subscription Agreement (the "Agreement" or "MSA").[20] The Agreement contained multiple terms outlining Talkdesk's services including a "minimum service level commitment."[21] The Agreement provided for termination in the event either party "materially breached this agreement and such breach remains uncured at the expiration of such thirty (30) day period[.]"[22] Arrive also insisted in Schedule A of the Agreement (the "Order Form") that Arrive may terminate the Agreement with written notice to Talkdesk within 30 days "[i]n the event (a) Talkdesk Service fails to achieve 98% Availability for three consecutive months, or (b) Talkdesk Service is unavailable for more than 24 consecutive hours for two consecutive months[.]"[23]

## E. TALKDESK'S ALLEGED BREACH OF THE AGREEMENT

Arrive learned early on that Talkdesk's product was "not at all suitable for the needs of" Arrive.[24] Arrive's employees dealt with a variety of issues with Talkdesk's services including connection failures, audio issues, stuck status, lack of

---

[19] *Id.* ¶ 31.
[20] *Id.* ¶ 32.
[21] *Id.* ¶¶ 33–34.
[22] *Id.* ¶¶ 35–36.
[23] *Id.* ¶ 37.
[24] *Id.* ¶ 38.

call-waiting and call transfer functions, lack of hard phone (SIP device) functionality, and inaccurate usage data.[25] These issues amounted to a failure to "achieve 98% Availability for any month during the parties' relationship" as was required by the Agreement.[26] Arrive employees stopped using Talkdesk products altogether and returned to using their personal phones for work.[27] Arrive "promptly and consistently raised these and other issues with Talkdesk," but Talkdesk "failed to address or cure these problems."[28] Talkdesk instead "responded by indifference, dragging their feet, ignoring the problems or trying to blame Arrive for the issues."[29]

Arrive eventually learned from Talkdesk's own employees that "Talkdesk had sold Arrive the wrong solution for Arrive's needs in order to license [Talkdesk's] higher-priced Professional Plus solution and lock in a more lucrative contract."[30] Talkdesk employees on multiple occasions admitted that Talkdesk's products were not suited for Arrive's needs.[31] These employees' allegations were supported by an independent consultant retained by Arrive, "who advised Arrive that Talkdesk had indeed oversold them on Talkdesk's most expensive solution designed for call centers (not a brokerage operation like Arrive operates), lacking the features and

---

[25] *Id.* ¶ 39.
[26] *Id.* ¶ 40.
[27] *Id.* ¶ 41.
[28] *Id.* ¶¶ 42–43.
[29] *Id.* ¶ 43.
[30] *Id.* ¶ 44.
[31] *Id.* ¶¶ 45–47.

functionality that Arrive did need, and including at a significant cost features that Arrive would never use."[32]

Over the course of the parties' relationship, Arrive has paid nearly $6.5 million to Talkdesk.[33] On July 12, 2023, Arrive sent Talkdesk a letter terminating the Agreement.[34] The letter served as thirty days' notice, and Arrive continued to pay Talkdesk for the costs and fees incurred up to August 12, 2023.[35]

### III. PROCEDURAL HISTORY

On August 1, 2023, Talkdesk filed a Complaint alleging four counts: (1) Anticipatory Breach of Contract;[36] (2) Breach of Contract;[37] (3) Attorneys' Fees;[38] and (4) Declaratory Judgment.[39] On August 28, 2023, Arrive filed an Answer, Affirmative Defenses and alleged eight Counterclaims: (1) Breach of Contract;[40] (2) Declaratory Judgment—Termination was Valid;[41] (3) Breach of Covenant of Good Faith and Fair Dealing;[42] (4) Unconscionability;[43] (5) Fraud in the Inducement;[44] (6)

---

[32] *Id.* ¶ 48.
[33] *Id.* ¶ 49.
[34] *Id.* ¶ 50.
[35] *Id.*
[36] Compl. ¶¶ 27–30.
[37] *Id.* ¶¶ 31–34.
[38] *Id.* ¶¶ 35–37.
[39] *Id.* ¶¶ 38–41.
[40] Countercl. ¶¶ 52–56.
[41] *Id.* ¶¶ 57–62.
[42] *Id.* ¶¶ 63–70.
[43] *Id.* ¶¶ 71–79.
[44] *Id.* ¶¶ 80–94.

Unjust Enrichment;[45] (7) Breach of the Implied Warranty of Fitness for a Particular Purpose;[46] and (8) Violation of California's Unfair Competition Law.[47]  On September 18, 2023, Talkdesk filed a Motion to Dismiss all eight of Arrive's Counterclaims for failure to state a claim.[48]  Briefing concluded on December 6, 2023.  The Court held oral argument on February 9, 2024, dismissed Counterclaim (3), and reserved decision on all other Counterclaims.

## IV.  STANDARD OF REVIEW

The law governing a motion to dismiss for failure to state a claim pursuant to Superior Court Civil Rule 12(b)(6) is well settled.  A court will dismiss for failure to state a claim "only if 'it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief.'"[49]  The court must "'accept all well-pleaded factual allegations in the Complaint as true and draw all reasonable inferences in favor of the plaintiff.'"[50]  "[E]ven vague allegations are 'well-pleaded' if they give the opposing party notice of the claim[.]"[51]  The court, however, need

---

[45] *Id.* ¶¶ 95–97.
[46] *Id.* ¶¶ 98–103.
[47] *Id.* ¶¶ 104–107.
[48] D.I. 6.
[49] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).
[50] *Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 289 A.3d 1274, 1282 (Del. 2023) (quoting *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 716 (Del. 2020)).
[51] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citing *Precision Air v. Standard Chlorine of Del.*, 654 A.2d 403, 406 (Del. 1995)).

8

not "accept as true conclusory allegations 'without specific supporting factual allegations.'"[52]

## V.    ANALYSIS

### A.    BREACH OF CONTRACT

#### 1.    The Parties' Contentions

Talkdesk asserts that breach of contract should be dismissed for two reasons: (1) "Arrive does not allege that Talkdesk violated any provision of the MSA" and (2) "Arrive concedes that it did not follow the MSA's notice requirements even if Talkdesk had breached the MSA."[53] As to the first issue, Talkdesk notes that the only challenged provision is that Talkdesk failed to provide 98% Availability, which is not supported by the pleadings.[54] As to the second issue, Talkdesk argues that even if Talkdesk breached the Agreement, Arrive failed to follow any of the Agreement's three required notice provisions of which compliance are "conditions precedent to Arrive's ability to receive any benefit under any of these three provisions[.]"[55] Talkdesk asserts that these notice provisions allow Talkdesk an opportunity to cure before Arrive can terminate the contract.[56]

---

[52] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (*In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

[53] Pl.'s Br. in Supp. of Pl.'s Mot. to Dismiss [hereinafter "Pl.'s Br."] at 20.

[54] *Id.* at 21–23.

[55] *Id.* at 23–24 (referring to Compl. Ex. 1, Master Subscription Agreement [hereinafter "The Agreement"], § 4(a), Schedule A Order Form, and § 13.3 of the Agreement).

[56] *Id.* at 24–25.

Arrive disputes these allegations by detailing the issues it was having with Talkdesk and how Talkdesk failed to remedy them, including, but not limited to, issues that indicated Talkdesk failed to achieve "98% Availability."[57] As to the notice requirements, Arrive argues that "Arrive was in constant communication with Talkdesk regarding the technical issues and lack of availability, giving Talkdesk both notice and the opportunity to cure."[58] Arrive also argued the notice requirement should be excused because compliance was "futile."[59]

Talkdesk emphasizes that to sufficiently plead a breach of contract, Arrive must plead what specific contract provision was breached, and Arrive failed to do so. Instead, Arrive only "tosse[d] against the wall a series of alleged failures by Talkdesk but none what [sic] is required under the contract itself."[60] The only provision Talkdesk credits is that Talkdesk failed to achieve 98% Availability, but argues even that fails because "Availability" is a defined term and Arrive did not plead a failure under the definition.[61] Talkdesk also notes that the facts pled do not establish "futility."[62]

---

[57] Def.'s Opp'n to Pl.'s Mot. to Dismiss [hereinafter "Def.'s Opp'n"] at 23–26.
[58] *Id.* at 26–27 (citing Countercl. ¶¶ 42–49 as examples).
[59] *Id.* (quoting *Optical Air Data Sys., LLC v. L-3 Commc'ns Corp.*, 2019 WL 328429, at *4 (Del. Super. Jan. 23, 2019)).
[60] Pl.'s Reply in Supp. of Pl.'s Mot. to Dismiss [hereinafter "Pl.'s Reply"] at 17.
[61] *Id.* at 18.
[62] *Id.* at 19.

2. Arrive has sufficiently pled a limited breach of contract claim, but only as to "Availability."

To survive a motion to dismiss a breach of contract, Arrive must allege "(1) the existence of a contract; (2) that the contract was breached; and (3) damages suffered as a result of the breach."[63] Arrive must "demonstrate substantial compliance with all provisions of the contract" to recover damages.[64] The court, at the motion to dismiss stage, will not "choose between two differing reasonable interpretations of ambiguous provisions."[65] Dismissal is "'proper only if [Talkdesk's] interpretation is the *only* reasonable construction as a matter of law.'"[66]

Arrive must establish an "express contractual obligation that was breached" to proceed on a breach of contract claim.[67] For example, in *Ryan v. Buckeye Partners, L.P.*,[68] the Court of Chancery dismissed a breach of contract claim where the plaintiff failed to cite any provision of the contract that was purportedly breached.[69] The court noted that "[t]his failure is not a technical foot fault; it reflects,

---

[63] *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3 (Del. Super. June 27, 2016) (citing *eCommerce Indus., Inc. v. MWA Intel. Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013)).
[64] *Sorantino v. Newton*, 2019 WL 2355018, at *1 (Del. Super. June 4, 2019) (citing *Shah v. Am Sols., Inc.*, 2012 WL 1413593, at *2 (Del. Super. Mar. 8, 2012)).
[65] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (citing *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).
[66] *Khushaim*, 2016 WL 3594752, at *3 (quoting *Vanderbilt Income & Growth Assocs.*, 691 A.2d at 613) (emphasis in original).
[67] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006).
[68] 2022 WL 389827 (Del. Ch. Feb. 9, 2022).
[69] *Id.* at *6.

instead, a fundamental failure to give the [defendants] fair notice of the claim asserted against them[.]"[70]

The Court holds that Arrive fails to allege specific contractual provisions or obligations that Talkdesk breached, with the exception of the requirements of Availability. The Court acknowledges that notice pleading is sufficient for a breach of contract claim at the motion to dismiss stage.[71] Nonetheless, generalized grievances over the performance of Talkdesk's product fail to put Talkdesk on notice of how it breached the Agreement. Without clear terms in the Agreement detailing performance expectations Arrive cannot allege a breach of those requirements.

For example, "[f]ailing to provide the correct and proper solutions to allow Arrive to conduct its business"[72] is entirely too vague and subjective to allow Talkdesk to prepare any defense. Similarly, "[f]ailing to provide the service required under the Agreement as evidenced by constant service connection issues, audio failures, stuck call statuses, inaccurate usage recording, and the inability to effectively support hard phones (SIP devices)"[73] is not specifically tied to any contractual provision that the parties bargained for and agreed to. Like in *Ryan*, the

---

[70] *Id.*

[71] *See, e.g.*, *VLIW Tech.*, 840 A.2d at 611 (internal quotations omitted) ("In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief.'").

[72] Countercl. ¶ 55.

[73] *Id.*

Court finds that there is insufficient notice to Talkdesk as to how it breached the Agreement as to all but the Availability allegations. If Arrive wanted specific product performance, it needed to be bargained for in the terms of the contract. The Court will not read in contract expectations that Arrive failed to negotiate for because Arrive is not satisfied with the result.

The only claim that survives the Motion to Dismiss is the "Availability" provision. Schedule C of the Agreement sets forth the "Minimum service level commitment" that "Talkdesk shall maintain 100% monthly minimum availability for the Talkdesk Service[.]"[74] The Agreement further defines "Availability" as "if: (1) the Customer is able to make and receive voice calls and (2) call quality is sufficient to allow participants in calls to hear and understand each other."[75] The availability is further calculated as:

$$\frac{(total\ number\ of\ minutes - (unavailable\ minutes - unavailability\ exclusions))}{total\ number\ of\ minutes} \times 100$$ [76]

The Agreement allows Arrive to terminate the Agreement "[i]n the event (a) Talkdesk Service fails to achieve 98% Availability for three consecutive months, or (b) Talkdesk Service is unavailable for more than 24 consecutive hours for two consecutive months[.]"[77]

---

[74] The Agreement, Schedule C (2).
[75] *Id.* at Schedule C (3)(a).
[76] *Id.* at Schedule C (3)(b).
[77] *Id.* at Schedule A Order Form.

13

Arrive pleads that there were issues with making and receiving voice calls, and the quality of those calls.[78] The Court determines that the liberal pleading standard[79] has been met regarding a failure to achieve 98% Availability at this stage. Talkdesk's skepticism as to whether "directly and negatively impacted" is sufficient to meet the definition of "Availability" and the corresponding calculation is a question better reserved for after discovery. The Court therefore denies the Motion to Dismiss as to the issue of "Availability" but grants the motion as to all other allegations of breach not tied to a specific contractual obligation.

3. <u>Arrive has sufficiently pled notice, and the Court declines to decide on the futility of the notice requirement at this stage.</u>[80]

The Agreement provides that Arrive can terminate the Agreement in three ways.[81] The first is for failure to achieve 98% Availability for three consecutive months "with written notice to Talkdesk within 30 days of such event."[82] It continues: "Termination as provided under this clause, if elected, is Customer's sole

---

[78] *E.g.*, Countercl. ¶ 39 ("Business Development and Carrier Sales team members regularly reported dropped connections, resulting in lost calls;" "Business Development and Carrier Sales team members regularly encountered issues on calls where either they or the person on the other end of the line could not hear"), ¶ 40 ("The connection failures, audio issues, stuck status situations, and lack of effective hard phone integration directly and negatively impacted the Availability of the Talkdesk Service at Arrive"), ¶ 55 ("Failing to achieve 98% Availability for any month during the parties' relationship").

[79] *See, e.g.*, *VLIW Tech.*, 840 A.2d at 611 (citing *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979)).

[80] This section will assume that a material breach of the agreement has occurred and solely address the applicability of the notice requirements.

[81] Pl.'s Br. at 23.

[82] The Agreement, Schedule A Order Form.

14

remedy."[83] The second termination option is in Schedule C, wherein the Agreement provides:

> If the Customer believes the Talkdesk Service has not met the minimum service level commitment in a given month, the Customer may request an SLA credit as detailed in the table below. To be eligible for an SLA credit, the Customer must deliver its request for an SLA credit no later than 7 days after the end of the month for which the SLA credit is requested and must include in its request a detailed description of the time and circumstances during which the Talkdesk Service was unavailable.[84]

The third option is detailed in § 13.3 of the Agreement, stating: "Either party may terminate the Service Term upon at least thirty (30) days prior written notice in the event (1) the other party has materially breached this agreement and such breach remains uncured at the expiration of such thirty (30) day period . . ."[85]

Talkdesk argues Arrive did not provide notice sufficient for any of the three options.[86] Arrive argues it did provide notice because "Arrive was in constant communication with Talkdesk regarding the technical issues and lack of availability, giving Talkdesk both notice and the opportunity to cure."[87]

---

[83] *Id.*

[84] *Id.* at Schedule C (4).

[85] The Agreement, § 13.3

[86] Pl.'s Br. at 23–24. Talkdesk also asserts in its Reply Brief that Arrive conceded it failed to give proper notice in its Opposition. Pl.'s Reply at 19. The Court does not agree with that characterization. Arrive appears to argue that it did give notice, but if the Court does not find notice, then in the alternative it argues that notice was futile and thus excused. Def.'s Opp'n at 26–27.

[87] Def.'s Opp'n at 26 (citing Countercl. ¶¶ 42–49).

15

The Court notes that both the Schedule A Order Form and Schedule C(4) discuss notice as a requirement in order to obtain a "credit." Arrive does not seek a "credit" as is outlined in the Agreement; therefore, the Court deems these two notice provisions inapplicable to the challenged action seeking monetary damages. Arrive is precluded from seeking a remedy pursuant to either "credit" option.

Unlike the Schedule A Order Form and Schedule C(4), the unambiguous terms of § 13.3 do not tie a remedy to any designated credit, and instead § 13.3 broadly addresses "termination." Arrive alleges that on July 12, 2023, Arrive sent a termination letter, giving Talkdesk 30-days advance notice of termination.[88] The Court thus finds at the very least, Arrive has sufficiently pled it complied with the notice requirement indicating a material breach as of July 12, 2023.

The Court notes that Arrive pled that, prior to July 12, 2023, Arrive contacted Talkdesk with problems, but never provided notice pursuant to § 13.3 until July 12, 2023.[89] The length of time to which Arrive can credibly plead prior to July 12, 2023 that Talkdesk materially breached the Agreement based on the termination letter is a question of fact.[90]

If Arrive seeks to assert breach based on conduct not indicated in the termination letter, but still within the confines of the allowable narrowed claim for

---

[88] Countercl. ¶ 50.
[89] *Id.* at ¶¶ 42–49.
[90] "[M]aterially breached" is not a defined term in the Agreement.

Availability, Arrive may proceed to discovery on the issue of whether or not notice would have been futile. Arrive asserts in the alternative, allowing additional time to cure would have been futile given Arrive's previous notices to Talkdesk about the issues.[91]

Courts have applied a "two-part test for determining whether a notice and cure provision was futile: (i) where 'the defaulting party expressly and unequivocally repudiates the contract,' or (ii) 'where the actions of the defaulting party have rendered future performance of the contract by the defaulting party impractical or impossible.'"[92] To the extent Arrive may rely on futility, the Court deems the issue a question of fact and not appropriate for decision at the motion to dismiss stage.[93]

## B. UNCONSCIONABILITY

An unconscionable contract is "one which 'no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other.'"[94] For a court to find unconscionability, "there must be an absence of

---

[91] Def.'s Opp'n at 26–27.

[92] *Optical Air Data Sys.*, 2019 WL 328429, at *4 (quoting *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at *13 (Del. Super. Dec. 7, 2012)).

[93] Relatedly, Talkdesk moves to dismiss Counterclaim Count (2) for Declaratory Judgment regarding the validity of the termination. Both parties agree the declaratory judgment claim rises and falls with the breach of contract claim. While it is unclear what relief Talkdesk seeks that is different than its breach of contract claim, the Court will nonetheless let Count (2) proceed as it relates to termination for failure to achieve "Availability."

[94] *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016) (quoting *Rsrvs. Mgmt., LLC v. Am. Acq. Prop. I, LLC*, 86 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (Del. 2014)).

meaningful choice and contract terms unreasonably favor[] one of the parties."[95]  A "mere disparity between the bargaining powers of parties to a contract will not support a finding of unconscionability."[96]  Courts should "sparingly" find unconscionability[97] because it "requires a finding that 'the party with superior bargaining power used it to take unfair advantage of its weaker counterpart'" and "its terms must be so one-sided as to be oppressive."[98]  Unconscionability is determined at the time the contract was formed[99] and is classified as either substantive or procedural; either are sufficient for a cause of action.[100]

Talkdesk quotes Arrive's description of itself as evidence that Arrive is a "sophisticated party in a strong position that flatly contradicts [Arrive's] claim that the parties held unequal bargaining power in their contracting relationship."[101]  Talkdesk notes that, despite Arrive claiming it was under pressure from the pandemic, "it still spent three months reviewing proposals and negotiating contract terms with Talkdesk" which shows that the negotiation and resulting contract was

---

[95] *Tulowitzki v. Atlantic Richfield Co.*, 396 A.2d 956, 960 (Del. 1978).
[96] *Rsrvs. Mgmt.*, 86 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (citing *Tulowitzki*, 396 A.2d at 960)).
[97] *Ketler*, 132 A.3d at 748 (citing *Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558383, at *11 (Del. Ch. July 9, 2002)).
[98] *Andor Pharms., LLC v. Lannett Co.*, 2024 WL 1855112, at *16 (Del. Super. Apr. 29, 2024) (quoting *Progressive Int'l Corp.*, 2022 WL 1558382, at *11).
[99] *James v. Nat'l Fin., LLC*, 132 A.3d 799, 814 (Del. Ch. 2016) (citing *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 173 (Del. Super. 1986)).
[100] *See id.* at 815 (internal citations omitted) ("The two dimensions of unconscionability do not function as separate elements of a two prong test.  The analysis is unitary, and 'it is generally agreed that if more of one is present, then less of the other is required.'").
[101] Pl.'s Br. at 17–18.

18

not unconscionable.[102]  Arrive denies this and argues the pandemic "put Arrive at a significant disadvantage to make a 'meaningful choice,' and resulted in Talkdesk driving the negotiations and bargaining" (procedural unconscionability).[103]  Arrive further asserts that Talkdesk intentionally oversold Arrive a product that did not suit Arrive's needs (substantive unconscionability).[104]

With regard to the procedural unconscionability, Talkdesk reinforces that "[i]f anything, the Counterclaims depict _Arrive_ as the party in the stronger bargaining position here given that [Arrive] had multiple other providers competitively bidding for its telecommunications needs and Talkdesk was merely one of 'a number of potential vendors.'"[105]  Talkdesk disputes that there is substantive unconscionability because Arrive fails to cite which term(s) of the Agreement are unfair, or _how_ they are "shockingly unfair terms that warrant having the court intervene[.]"[106]

1.      Arrive fails to plead substantive unconscionability.

Substantive unconscionability considers "if the terms evidence a gross imbalance that 'shocks the conscience.'"[107]  To find substantive unconscionability, "the court will look to see if the terms of the contract were 'atypical in the local

---

[102] _Id._ at 18.
[103] Def.'s Opp'n at 22.
[104] _Id._ at 22–23.
[105] Pl.'s Reply at 15 (emphasis in original).
[106] _Id._ at 16.
[107] _James_, 132 A.3d at 815 (internal citations omitted).

business community.'"[108]  A court can consider six factors: (1) a significant cost-price disparity or excessive price; (2) the denial of basic rights and remedies; (3) penalty clauses; (4) the placement of disadvantageous clauses in inconspicuous locations or among fine print trivia; (5) the phrasing of disadvantageous clauses in confusing language or in a manner that obscures the problems they raise; and (6) an overall imbalance in the obligations and rights imposed by the bargain.[109]

Arrive has failed to indicate what portions of the Agreement are unconscionable.  Instead, Arrive only alleges that "the terms of the MSA provided Arrive access to Talkdesk's highest-priced solution, which Talkdesk knew was not going to meet Arrive's operational needs."[110]  In the paragraphs from the Counterclaim that Arrive cites to support its substantive unconscionability argument, Arrive describes what it was hoping to purchase, and what it received from Talkdesk's products, but cited no portion of the Agreement itself.[111]  Arrive also fails to provide any comparable case where a contract was found to be substantively unconscionable because the product bargained for did not meet the negotiated qualifications.  Arrive has failed to plead any of the six factors for substantive unconscionability, to demonstrate that the *terms* of the agreement would

---

[108] *Rummel Klepper & Kahl, LLP v. Delaware River & Bay Authority*, 2022 WL 29831, at *14 (Del. Ch. Jan. 3, 2022) (citing *Tulowitzki*, 396 A.2d at 960).
[109] *James*, 132 A.3d at 815–16 (citing *Fritz v. Nationwide Mut. Ins. Co.*, 1990 WL 186448, at *4–5 (Del. Ch. Nov. 26, 1990)).
[110] Def.'s Opp'n at 22.
[111] *See id.* (citing Countercl. ¶¶ 44–49, 67, 76–78, 86–89, 91, 100).

*shock the conscience*. Even if the Court credits that Talkdesk knew the product would not suit Arrive's needs, Arrive does not explain how the *terms* of the contract themselves amount to an unfair agreement.

2.    Arrive fails to plead procedural unconscionability.

Procedural unconscionability "examines the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining."[112]   Courts will look at the "'relative bargaining strength of the parties and whether the weaker party could make a meaningful choice.'"[113]   Courts consider factors including: (1) "[i]nequality of bargaining or economic power;" (2) "[e]xploitation of the underprivileged, unsophisticated, uneducated, and illiterate;" (3) "[t]he use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position;" and (4) "[t]he circumstances surrounding the execution of the contract, including its commercial setting, its purpose, and actual effect."[114]   "[T]he court must find that the party with the superior bargaining power used this disparity to take advantage of the weaker party, resulting in terms being

---

[112] *James*, 132 A.3d at 815.

[113] *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *12 (Del. Ch. Mar. 30, 2020) (citing *James*, 132 A.3d at 815)).

[114] *James*, 132 A.3d at 826 (citing *Fritz*, 1990 WL 186448, at *4–5).

21

'so one-sided as to be oppressive.'"[115] Delaware courts have been "particularly reluctant to find unconscionability in contracts between sophisticated corporations."[116]

Arrive describes itself as a "leading North American freight broker" that has received "excellent customer service" praise, "has been recognized as a top workplace by Inc., Fortune, Great Place to Work, the Austin American-Statesman and The Chicago Tribune" and has been awarded Carrier of the Year by several others.[117] Arrive is also one of "the largest firms in the freight brokerage industry with more than 2,000 employees, 6,000 customers, and 38,000 active motor carriers in its network and 70,000 motor carriers under contract."[118] This description alone suggests that Arrive is a sophisticated party, not one in an unequal bargaining position. Arrive has not demonstrated that there is any unfair bargaining power between itself and "a cloud-based call-center software provider."[119]

Arrive's reliance on the pressures of the COVID-19 pandemic are similarly unconvincing. This Court recognizes the significant impact that the pandemic had across the globe, but Arrive has failed to indicate how Arrive was uniquely impacted in a way that all other in-person workplaces forced to shift to work-from-home

---

[115] *Rummel Klepper & Kahl, LLP*, 2022 WL 29831, at *15 (citing *Graham v. State Farm Mut. Auto Ins., Co.*, 565 A.2d 908, 912 (Del. 1989)).
[116] *Rsrvs. Mgmt.*, 86 A.3d 1119 (TABLE), 2014 WL 823407, at *9 (internal citations omitted).
[117] Countercl. ¶ 5.
[118] *Id.* ¶ 7.
[119] *Id.* ¶ 6.

solutions were not. The Court has reviewed Arrive's description of its work process and understands that shifting to a service provider during the pandemic may have been crucial to its business, but that is the extent that the pandemic is relevant.

Arrive "engaged with a number of potential vendors" and asked "more than 150 questions" to each vendor to determine their capabilities.[120] Talkdesk was "one of the potential providers" that Arrive considered between April and June 2020.[121] The parties met and communicated several times over the three month period to discuss solutions and Arrive's needs before entering into the contract.[122] The Court fails to see how there was any imbalance of bargaining power between two sophisticated parties. Arrive had multiple options for vendors, took three months to sign an agreement, and was, in the interim, managing to maintain its business practices, however inconvenient or inefficient it may have been.

This is not the case of a business that was forced to shut down entirely, nor does Arrive plead that it had to immediately enter into an agreement with Talkdesk because Arrive had no other options. The COVID-19 pandemic undoubtedly caused complications for Arrive, but the Court does not find that "one of the largest firms in the freight brokerage industry" was at such an unequal bargaining power when conversing with multiple vendors across multiple months that Arrive "could not

---

[120] *Id.* ¶ 20.
[121] *Id.* ¶ 21.
[122] *Id.* ¶¶ 23–31.

make a meaningful choice." The Court declines to find procedural unconscionability present under these facts. Counterclaim Count (4) is therefore dismissed.

## C. FRAUD IN THE INDUCEMENT

To sufficiently plead a claim for fraud in the inducement, the plaintiff must allege: "'1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result.'"[123] "To establish th[e] requisite *scienter*, a plaintiff can show the defendants either 'committed the misstatement recklessly or with intent.'"[124] Recklessness is not "merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care[.]"[125]

Talkdesk seeks to dismiss the fraud in the inducement claim for three reasons: (1) the claim is foreclosed by the contract's integration clause; (2) the economic loss doctrine bars recovery; and (3) Arrive's fraud in the inducement claim is not pled with specificity as required by Superior Court Civil Rule 9(b). The Court finds that although the integration clause lacks anti-reliance language that explicitly provides

---

[123] *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Mar. 6, 2017) (quoting *In re Student Fin. Corp.*, 2004 WL 609329, at *7 (D. Del. Mar. 23, 2004)).
[124] *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) (quoting *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (emphasis in original).
[125] *Deloitte*, 2009 WL 5200657, at *8.

that a party is not relying on any extra-contractual relations, Arrive's fraud claim still fails. This is because the essence of Arrive's Counterclaim is based on future performance, and the integration clause prevents the Court from finding justifiable reliance. Thus, the Court need not reach the issue of the economic loss doctrine.

As a preliminary matter, Talkdesk argues that Sections 11.1 and 15.10 of the Agreement, when read together, preclude Arrive's fraud in the inducement claims.

Section 11.1 of the Agreement states:

> Customer acknowledges and agrees that the services, marketplace and documentation are provided on an 'as is' basis and Talkdesk does not make any and hereby specifically disclaims any representations, endorsements, guarantees, or warranties, express or implied, including, without limitation, any of merchantability, fitness for a particular purpose, title, or nonfringement of intellectual property rights. Content and early access services are provided 'as is,' and as available exclusive of any warranty whatsoever.[126]

Section 15.10 of the Agreement (the "Integration Clause") reads:

> This Agreement constitutes the entire and sole agreement among the parties with respect to the subject matter hereof and supersedes any previous and contemporaneous verbal agreements, negotiations, understandings, or other matters, whether oral or written, with respect to the subject matter hereof.[127]

To be effective, merger or integration clauses must clearly disclaim reliance upon extra-contractual statements.[128] "[S]tandard integration clauses without

---

[126] The Agreement at § 11.1.
[127] *Id.* at § 15.10.
[128] *See, e.g.*, *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1058–59 (Del. Ch. 2006).

explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."[129]  To sufficiently bar fraud in the inducement, an integration clause "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[130]  Delaware case law, since *Kronenberg v. Katz*,[131] has developed a well-worn path for parties wishing to disclaim reliance on extra-contractual representations.  Put simply, the Integration Clause here, even when read with Section 11.1, does not amount to a clear "anti-reliance" provision.[132]

This, however, does not end the inquiry.  Talkdesk argues that Arrive's fraud claims must fail because Arrive fails to plead justifiable reliance.[133]  The Court agrees. "[W]hether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss."[134] Nonetheless, "Delaware courts have found a lack of justifiable reliance at the pleading stage when the dispute involves alleged

---

[129] *Id.* at 1059 (citing *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).

[130] *Kronenberg*, 872 A.2d at 593.

[131] 872 A.2d 568 (Del. Ch. 2004)

[132] *Compare Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50–51 (Del. Ch. 2015) (holding that the Exclusive Representations Clause and Integration Clause together identified "with sufficient clarity the universe of information on which the contracting parties relied," and therefore "add[ed] up to a clear anti-reliance clause.").

[133] Pl.'s Reply at 6–10.

[134] *S'holder Rep. Srvs. LLC v. Albertsons Co.*, 2021 WL 2311455, at *11 (Del. Ch. June 7, 2021) (quoting *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726 (Del. Super. Sept. 25, 2015)).

26

prior misrepresentations or omissions that run expressly counter to the terms of a fully integrated contract."[135] Two cases establish this point.

In *Black Horse Capital, LP v. Xstelos Holdings, Inc.*,[136] the Court of Chancery dismissed a fraud claim because there was no justifiable reliance on the allegedly fraudulent statements.[137] Plaintiffs alleged that defendants promised in 2010 that "if Plaintiffs would make the [loan], Defendants would give an additional [defined interest.]"[138] The court held that it "is not reasonably conceivable that Plaintiffs justifiably could have relied on that December 2010 promise as being enforceable while executing multiple written agreements on January 3, 2011 in which Plaintiffs disclaimed any and all prior promises, agreements, or understandings[.]"[139] The court distinguished this finding on the "future promise" compared to other cases "which dealt with materially incorrect financial statements, reliance on which caused the plaintiff buyers to overestimate how much the target company was worth."[140]

*Shareholder Representative Services LLC v. Albertsons Companies, Inc.*,[141] relied on *Black Horse* when it similarly found that an integration clause prevented the court from finding justifiable reliance.[142] The Court of Chancery held that "the

---

[135] *Id.* at *11 (internal citations omitted).
[136] 2014 WL 5025926 (Del. Ch. Sept. 30, 2014).
[137] *Id.* at *22.
[138] *Id.*
[139] *Id.*
[140] *Id.* at *25.
[141] 2021 WL 2311455 (Del. Ch. June 7, 2021).
[142] *Id.* at *12.

plain terms of the Merger Agreement contradict the alleged misrepresentations on which [Plaintiff] claims it relied."[143] "As distinguished from a claim of extra-contractual fraud based on a statement of fact, the fraud claim based on 'future promises' amounts to an improper attempt to introduce 'parol evidence that would vary the extant terms in the subsequent integration writings.'"[144] The plaintiff alleged it was promised it would have the exclusive right to make all business decisions, but the contract signed after the promise did not contain any such promise.[145] Had the plaintiff wanted contractual commitments as to how the parties would operate post-contract, plaintiff "could and should have bargained for those commitments[.]"[146]

There is no dispute that Section 15.5 of the Agreement is an integration clause applicable to both parties. Like in *Albertsons*, if Arrive wanted to ensure it was getting a particular product or service, Arrive "could and should have" specifically bargained for those requirements to be outlined in the contract.[147] Arrive, although upset with the services it received, "cannot now claim fraud as the basis to avoid the

---

[143] *Id.*

[144] *Id.* (quoting *Black Horse*, 2014 WL 5025926, at *24).

[145] *Id.*

[146] *Id.* at *13.

[147] *See Black Horse*, 2014 WL 5025926, at *25 ("There is . . . considerable support in logic and the law for the notion that it is efficient to hold parties to the promises they make in an integrated writing, and only those promises.").

deal it made in favor of the deal it now wishes it made."[148]  Counterclaim Count (5) is therefore dismissed.

## D.  UNJUST ENRICHMENT

Unjust enrichment refers to the "'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience.'"[149]  Unjust enrichment "can operate either as a cause of action or as a remedy."[150]  To plead an unjust enrichment, the plaintiff must assert: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, [and] (4) the absence of justification[.]"[151]

A claim for unjust enrichment must be dismissed "if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[152]  "'[I]f recovery is possible under the contract,' then the contract controls and a duplicative unjust enrichment claim will be dismissed as an attempt to obtain

---

[148] *Albertsons*, 2021 WL 2311455, at *13 (internal quotation omitted).
[149] *In re Verizon Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).
[150] *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022).  "It remains possible that even if the court dismissed the substantive claim for unjust enrichment, the court still could award a restitutionary remedy that could be described as a remedy for unjust enrichment." *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14 (2002)).
[151] *Nemec*, 911 A.2d at 1130 (citing *Jackson Nat. Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999)).  *See also State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 391 (Del. 2023) ("The absence of an adequate remedy at law is required only if an unjust enrichment claim is brought in the Court of Chancery and there is no other independent basis for equitable jurisdiction.").
[152] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

double recovery."[153] Where the enforceability of the contract is called into question by the pleadings, an unjust enrichment claim may be pled as an alternative to a breach of contract claim.[154] Another exception to the duplicative limitation is where the contract itself is the unjust enrichment.[155] An unjust enrichment claim will not be dismissed at the motion to dismiss stage if "'[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract.'"[156]

Talkdesk asserts that the claim for unjust enrichment must be dismissed because the Agreement governs the parties' relationship.[157] Rather than pleading the unjust enrichment as an alternative, Talkdesk points out that Arrive's allegations "are identical—they rely upon the same alleged conduct and the same damages."[158] Arrive's response to this criticism is two-fold. Arrive first asserts (in its Answering Brief, not its Counterclaim) that the Agreement *itself* is the unjust enrichment and

[153] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *17 (Del. Super. Aug. 16, 2021) (quoting *Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 140919, at *10 (Del. Super. Jan. 15, 2021)).
[154] *See, e.g.*, *Khushaim*, 2016 WL 3594752, at *8 (citing *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005)).
[155] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018) (citing *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008)).
[156] *Id.* at *16 (internal citations omitted).
[157] Pl.'s Br. at 18.
[158] *Id.* at 19.

therefore the existence of the Agreement does not bar the claim.[159] Arrive then claims that alternative pleading, which Arrive did here, is permitted when the enforceability of the contract is challenged, which Arrive argues (in its Answering Brief, not its Counterclaim) it did by pleading that the contract was unconscionable.[160] Talkdesk reinforces that the claim for unjust enrichment is "derivative of its contract claim and thus fails."[161]

In *Kuroda v. SPJS Holdings, L.L.C.*,[162] the Court of Chancery dismissed a claim for unjust enrichment because the plaintiff's relationship with the defendants was governed by an express contract.[163] The plaintiff asserted that "defendants were unjustly enriched by the services '[the plaintiff] provided pursuant to the Consulting Agreement'" when they failed to pay him.[164] The unjust enrichment claim, thus, "cannot lie alongside [the] breach of contract claim, [so] the unjust enrichment claim must be dismissed."[165]

In *LVI Group Investments, LLC v. NCM Group Holdings, LLC*,[166] by contrast, the Court of Chancery declined to dismiss an unjust enrichment claim as duplicative

---

[159] Def.'s Opp'n at 32.
[160] *Id.* at 33.
[161] Pl.'s Reply at 22–23.
[162] 971 A.2d 872 (Del. Ch. 2009).
[163] *Id.* at 891.
[164] *Id.*
[165] *Id.*
[166] 2018 WL 1559936 (Del. Ch. Mar. 28, 2018).

of the breach of contract claim.[167] The plaintiff alleged that "it would never have entered into the agreement but for" defendant's false statements.[168] The court held that "because the Complaint adequately alleges that the [agreement] itself arose from the Defendant's fraud, the existence of that contract does not bar the unjust enrichment claim."[169]

The Court notes that the enforceability of the Agreement is not at issue because of the Court's decision to dismiss the unconscionability count; therefore, Arrive's argument that "the contract is unconscionable, and, therefore unenforceable," fails.[170] While Talkdesk argues that the unjust enrichment claim is based on the "same alleged conduct and the same damages" as the breach of contract claim,[171] the Court holds that the unjust enrichment claim is merely a dressed up claim for fraudulent inducement. The only allegation in Count Six to support its unjust enrichment claim is as follows:

> Talkdesk induced Arrive to enter into the Agreement with the understanding and promise that it would provide a Professional Plus product solution for all of Arrive's business needs. Talkdesk has failed to live up to its obligations under the Agreement, and, therefore, has been unjustly enriched in over $6,500,000 throughout the course of the parties' relationship.[172]

---

[167] *Id.* at *17.
[168] *Id.*
[169] *Id.*
[170] *See supra* Section V.B.
[171] Pl.'s Br. at 19.
[172] Countercl. ¶ 97.

Similarly, the Fraud in the Inducement count contains the following allegation:

> Talkdesk made the false representations about its Professional Plus product and intentionally failed to disclose material information about its capabilities to induce Arrive to execute the Agreement and oversell a more expensive product.[173]

The Court struggles to find any meaningful difference between these two allegations. Thus, although dressed up as a claim for "unjust enrichment," the Court finds that this is also a claim for fraud—and it fails for the same reasons outlined above.[174] Counterclaim Count (6) is therefore dismissed.

## E. BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

Implied warranty of fitness for a particular purpose requires a plaintiff to prove that "(1) she had a special purpose for the goods; (2) defendant knew or had reason to know of that purpose; (3) defendant knew or had reason to know that the plaintiff/buyer was relying on the seller's superior skill to select goods that fulfilled that purpose; and (4) the plaintiff in fact relied on defendant's superior skill."[175]

---

[173] *Id.* ¶ 91.

[174] The Court notes that in *LVI*, the Court of Chancery permitted the unjust enrichment claim as an alternative pleading to the fraud claim in that action. 2018 WL 1559936, at *16–17 ("If LVI were to succeed in establishing that the EPP Defendants committed (or conspired to commit) fraud, it would have an adequate remedy at law and unjust enrichment would be unnecessary. But LVI may be unable to prove those claims. In that case, unjust enrichment might be invoked."). Here, the Court finds that the unjust enrichment claim is not in the alternative, but rather duplicative and identical, to the fraud claim. As such, dismissal is appropriate.

[175] *Johnson v. Sleepy's Hldgs., L.L.C.*, 2015 WL 3429518, at *2 (Del. Super. May 28, 2015) (citing *Atamian v. Ryan*, 2006 WL 1816936, at *4 (Del. Super. June 9, 2006)).

Delaware allows parties to "exclude or modify any implied warranty of fitness" as long as the exclusion is in "writing and conspicuous."[176] "[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty[.]"[177]

> Section 11.1 of the Agreement outlines:

> General Disclaimer. Customer acknowledges and agrees that the services, marketplace and the documentation are provided on an 'as is' basis and Talkdesk does not make any and hereby specifically disclaims any representations, endorsements, guarantees, or warranties, express or implied, including, without limitation, any of the merchantability, *fitness for a particular purpose*, title, or noninfringement of intellectual property rights. Content and early access services are provided 'as is,' and as available exclusive of any warranty whatsoever.[178]

Talkdesk asserts that the language of Section 11.1 is an exclusion of the implied warranty of fitness for a particular purpose and therefore this claim must be dismissed.[179] Arrive argues that it has sufficiently pled under the low pleading standards an implied warranty of fitness for a particular purpose and "[a]ny questions regarding the provision in the MSA are questions of fact and, therefore,

---

[176] 6 *Del. C.* § 2-316(2). "Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" *Id.*
[177] 6 *Del. C.* § 2-316(3)(a).
[178] The Agreement, Schedule B § 11.1 (emphasis added).
[179] Pl.'s Br. at 19–20.

inappropriate at the pleading stage."[180]  Talkdesk responds that interpretation of an unambiguous contract, as is the case here, is a question of law, not fact, and therefore this Court can proceed to dismiss the claim.[181]

The only case Arrive relies on to avoid dismissal is insufficient to overcome an otherwise unambiguous contract term.    While *Anesthesia Services, P.A. v. Winters* holds that "[f]actual issues cannot be resolved at the motion to dismiss stage,[182]  Arrive fails to explain how interpreting an explicit waiver of the implied warranty of fitness for a particular purpose in a contract is a factual issue.  Delaware law has long considered contract interpretation a question of law, rather than a question of fact.[183]  "The Court will interpret clear and unambiguous terms according to their ordinary meaning."[184]  A contract is ambiguous when "we may reasonably

---

[180] Def.'s Opp'n at 27–28 (citing *Anesthesia Servs., P.A. v. Winters*, 2010 WL 4056141, at *3 (Del. Super. Oct. 6, 2010)).

[181] Pl.'s Reply at 20–21.

[182] *Anesthesia Servs., P.A.*, 2010 WL 4056141, at *3.  This case deals with breach of contract issues, but does not deal with a breach of the implied warranty of fitness for a particular purpose at all.

[183] *See, e.g.*, *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997) ("Under Delaware law, the interpretation of contract language is treated as a question of law.") (internal citations omitted); *Intel Corp. v. Am. Guarantee & Liab. Ins. Co.*, 51 A.3d 442, 446 (Del. 2012) ("'[I]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation.'") (internal citations omitted); *Pike Creek Recreational Servs., LLC v. New Castle Cty.*, 238 A.3d 208, 213 (Del. Super. 2020) ("[T]he only remaining questions are those of statutory and contract interpretation.  Both topics are solely questions of law for the Court to decide.") (internal citations omitted); *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del. Ch. Mar. 14, 2006) ("Under Delaware law, the 'proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal,' and 'judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts.'") (internal citations omitted).

[184] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)).

ascribe multiple and different interpretations to a contract[.]"[185] Arrive has not alleged that the Agreement is in any way ambiguous. The Court also cannot read any other reasonable interpretation than Talkdesk's interpretation: "Talkdesk does not make any and hereby specifically disclaims . . . *fitness for a particular purpose . . .*"[186] The use of "as is" language throughout Section 11.1 also reinforces the disclaimer by mirroring language suggested in the Delaware Code.[187] The ordinary meaning of the Agreement is that the parties specifically disclaimed any claim for implied warranty of fitness for a particular purpose. As such, Counterclaim Count VII is dismissed.

## F.  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"[188]

Talkdesk argues that, since all claims should be dismissed at the motion to dismiss stage, Arrive has consequently also "failed to allege a cause of action under California's UCL."[189] Arrive argues that it only needs to sufficiently plead one of

---

[185] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) (citing *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).
[186] The Agreement, § 11.1.
[187] 6 *Del. C.* § 2-316(3)(a) (stating "all implied warranties are excluded by expressions like 'as is'").
[188] Cal. Bus. & Prof. Code § 17200, *et seq.*
[189] Pl.'s Br. at 28.

an unlawful, unfair, or fraudulent business practice, and since Arrive asserts it has sufficiently pled its claim for fraudulent inducement, the violation of the UCL has also been pled.[190] The Court notes that neither party argues for a choice of law analysis at this stage, and both sides rely on their success on the other claims to support their success as to the UCL. The Court, therefore, determines that Arrive has failed to state a claim as to a violation of the UCL because the Court has already determined that Arrive has not stated a claim as to fraudulent inducement.

## VI.   CONCLUSION

In conclusion, Plaintiff's Motion to Dismiss Defendant's Counterclaims is Granted in Part, and Denied in Part.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**

---

[190] Def.'s Opp'n at 33–34.